## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
BARBARA ST. PIERRE and                  )
LYNN GUILLOTTE                          )
                                        )
        Plaintiffs,                     )
                                        )          **CIVIL ACTION**
        v.                              )          **NO. 13-13202-TSH**
                                        )
CVS PHARMACY, INC.,                     )
MASSACHUSETTS CVS PHARMACY,             )
LLC, MASSACHUSETTS CVS                   )
PHARMACY, INC., and CVS                 )
CAREMARK CORPORATION                    )
                                        )
        Defendants.                     )
_____)

### MEMORANDUM OF DECISION
### September 18, 2017

HILLMAN, D.J.

### Introduction

In December 2016, this Court held a bench trial of Plaintiffs Barbara St. Pierre's and

Lynn Guillotte's jury-waived claims of violations of the Massachusetts Wage Act, the

Massachusetts Minimum Wage Law, and Breach of Contract. The Court now issues its findings

of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### Findings of Facts

Based on trial testimony and admitted exhibits, I find as follows. Barbara St. Pierre and

Lynn Guillotte are former employees of the CVS-branded store located at 197 Boston Turnpike,

Shrewsbury, Massachusetts (Store No. 8). St. Pierre was employed at Store No. 8 from April

2011 – July 2015, and Guillotte from July 2001 – March 2013. Both St. Pierre and Guillotte

1

were pharmacy technicians ("PTs") – hourly employees responsible for production of prescriptions, entering prescriptions into the system, and delivering customer service.

*LEARNet Training Requirements*

CVS Pharmacy requires all PTs, including St. Pierre and Guillotte, to regularly complete mandatory training courses through LEARNet, an online "learning management system." LEARNet administers training courses covering a variety of topics from new computer systems to changes in the law. LEARNet tracks the courses completed by each employee, including the date and time at which training was completed, and in some instances, the dates and times of failed attempts to complete training. LEARNet neither records the length of time taken to complete a training activity, nor the incidence of training effort that did not result in an attempt to complete a course. LEARNet is designed to allow users to complete trainings from any location with internet access. There is no dispute that training conducted on the LEARNet system is compensable time as a matter of law.

*CVS Time and Compensation Policies*

It is CVS policy that, as hourly employees, all PTs must record and report all time worked, and must review and sign their time cards to verify that they have been paid for all hours worked. It is also CVS policy that all PTs must be paid for time spent on LEARNet, whether done at the store, or remotely. It is a violation of CVS policy for PTs to work "off-the-clock" (i.e., uncompensated), or for anyone to instruct or encourage another employee to perform uncompensated work. This policy is communicated to pharmacy and store managers through a mandatory LEARNet training module, however, there was no equivalent training module for PTs

regarding whether they were entitled to compensation for time spent on LEARNet training outside of scheduled shifts, or how to be paid for such training.  Instead, the CVS timekeeping and payroll policies are conveyed to PTs via the employee handbook and the "policy portal." The version of the policy that the PT receives, "Policy on Timekeeping and Payroll Practices," which discusses time and compensation policies for "work," does not expressly mention training time or LEARNet, does not specify whether such time is compensable as "work," and does not indicate how an employee is to receive compensation for time spent on training outside of a scheduled shift at the store.  The CVS handbook specifies that an employee who is directed or encouraged to incorrectly report their hours worked should report the incident to [his/her] supervisor, Human Resource Business Partner, *or* the CVS Ethics Hotline.

### *Store Budget*

Store No. 8 was provided with a budget for the total number of employee work hours for the month.  To stay within its assigned budget, the store had to limit the number of total hours worked by PTs.  Hours spent on LEARNet training were included in the budgeted hours, whether done at or away from the store.  Store No. 8 consistently used all, or nearly all, of its budgeted hours every week for scheduled shift work, so that there were not sufficient hours available to schedule off-shift training.  Store No. 8 had a particularly busy pharmacy, and PTs typically did not have time available to work on LEARNet during their scheduled shifts.

### *Reporting Time Spent on LEARNet*

Pharmacy technicians are required to log into a Point-of-Sale (POS) system in the store at the beginning of their shift, and logout at the end of a shift.  If a PT does a LEARNet training

module during their shift, they are paid for that time because they are already "on the clock." While it appears technologically plausible for CVS to electronically track time spent in LEARNet and automatically enter that time into the payroll system, the system was not set up to do so.[1]

The only way for a PT to be paid for hours spent on LEARNet training outside of Store No. 8 was to report the time to their Lead PT, have the Lead PT enter it into the schedule, and ensure that the store manager or shift supervisor entered those hours into the payroll system. Only store managers (and not the pharmacy manager or Lead PT) can input the time into the CVS payroll system. This was established through the testimony of pharmacy manager Chris Moses and store manager Terry Shea-Gehlert. Chris Moses testified that a PT must report LEARNet time done outside of a scheduled shift to their Lead PT, and that, as a pharmacy manager, he would not be the person responsible for receiving that information from PTs or ensuring that the time was compensated. If a PT were to report the time to him, he would tell the Lead PT who would then report it to the shift supervisor, because all payroll was handled by the "front store" only. Here "front store" means the CVS store within which the Pharmacy operates. As pharmacy manager, he would not check to make sure that the hours were ever recorded. Moses acknowledged that he was in charge of making sure mandatory training was completed, but claimed that it was the store manager's responsibility to make sure that the hours were reported, recorded, and paid. Moses knew that St. Pierre was completing LEARNet training at

---

[1] Testimony indicated that the electronic systems within the Pharmacy provide extremely granular accounting of PT activity, including minute-to-minute accountability for handling prescriptions and medicines. While the Court can envision that such accountability systems could be used to provide timekeeping functions that might have assisted CVS in meeting their obligations to pay for all hours worked, the Court in no way endorses the suggestion that a mere technical possibility creates any obligation for CVS to do so.

home, but never verified that she was paid for that time.  Moses stated that this was the regular way pharmacy managers operated.

Store manager Terry Shea-Gehlert testified that it was St. Pierre's responsibility to report mandatory LEARNet time, and the Lead PT's responsibility to add that time to the schedule and send it to Shea-Gehlert.  At that point, Shea-Gehlert would enter the time into payroll.  Shea-Gehlert knew that St. Pierre did at least some LEARNet training at home, but testified that it was not her responsibility to follow up and make sure that St. Pierre was paid for the time.  The Court notes that there was a hierarchy of supervisory and managerial employees variously responsible for scheduling work (including training), ensuring that training was completed, and managing payroll and payroll budget.  The most senior representative of CVS at Store No. 8, the Store Manager, was both a) aware that at least one employee performed training outside their regular shift, and b) was directly responsible for compensation by entering time into the payroll system.


### *CVS knew PTs completed LEARNet training outside of scheduled shifts*

From a corporate standpoint, CVS knew that PTs completed mandatory trainings outside of their schedule shifts, from home or another non-CVS location, and had designed the LEARNet system with that purpose in mind.  It was common enough that LEARNet training was done outside of the store that CVS had a mandatory training module for managers covering the topic to ensure PTs were paid for that time.

At Store No. 8, both store and pharmacy managers knew mandatory trainings on LEARNet were done by employees outside of their scheduled shifts, from home or another non-CVS location.  Both store and pharmacy managers instructed employees to complete LEARNet training at home when there was insufficient time for the employee to complete the training

during his/her shift at the store.  On occasion, CVS required a course to be completed before a PT could return to work for his/her next shift.

In addition to managers, Lead PTs instructed PTs to complete mandatory LEARNet training at home when there was not enough time to complete training during their shift.  Lead PTs served as first line supervisors responsible for scheduling PTs' shifts, assigning PTs to particular stations or tasks in the pharmacy, overseeing the work they did, ensuring PTs completed mandatory trainings, and adding PTs hours, including training hours worked off-shift, to the schedule so they could be paid.  Because CVS did not provide company email addresses to PTs, Lead PTs also served as the primary point of communication for the PTs.  St. Pierre testified that she was specifically told to complete LEARNet training away from the store by Lead PTs Christine Frederick and Angela Amoroso.  Guillote also testified that she was instructed to complete LEARNet training at home.

*CVS knew that PTs were not being compensated for all LEARNet training time*

St. Pierre testified that she was told on multiple occasions by pharmacy managers and Lead PTs that she would not be paid for mandatory LEARNet training done outside the store. She discussed the issue of compensation for time spent on training with Pharmacy Manager Betsy Ingram and was told that she would not be paid for that time.  On a later occasion, Pharmacy Manager Leanne Languirand told St. Pierre that the mandatory training modules were to be done on one's own time, and were not compensated because the training was considered "continuing education."  After informing Languirand that the Attorney General explained training time was to be compensated, Languirand permitted St. Pierre to perform her LEARNet training during her shift, but only for that day.

Lead PT Christine Fredericks told St. Pierre that she would submit St. Pierre's time sheet for hours spent doing LEARNet training away from the store, but that CVS wouldn't pay it, and had refused to pay any of the other time submitted previously, including Fredericks's own.  As a result of this exchange, St. Pierre declined to have Fredericks submit the time because she believed that she wouldn't be paid for it.  I find that CVS pharmacy managers and Lead PTs knew that St. Pierre was performing mandatory LEARNet training, and knew that this work was uncompensated.

Guillotte also testified to being repeatedly told that LEARNet training done at home was not compensable by Lead PTs and managers.  Lead PT Angela Amoroso told Guillotte that she would not include those training hours on the schedule because it would exceed the store's budget of PT hours.  When Guillotte then approached Lead PT Christine Fredericks about being paid for LEARNet training done at home, she was told that Amoroso was in charge of it.  When Guillotte notified her that she had already spoken to Amoroso, Fredericks told her that she had to get it done one way or another.  Thus, I find that in addition to senior and midlevel staff within the staff hierarchy at Store No. 8, the most junior of the supervisory and managerial staff, the Lead Pharmacy Technicians, were also a) aware that employees performed uncompensated work outside their regular shift, and b) were responsible for compensation through their responsibilities to both schedule and report non-shift work.

In addition to the Lead PTs, a store manager and pharmacy managers indicated that Guillotte's LEARNet training outside of the store would not be compensated.  Pharmacy Manager Susan Chavaries told Guillotte that LEARNet training was unpaid.  When Guillotte asked Pharmacy Manager Languirand about getting paid for time-consuming semi-annual training on LEARNet, she was told that mandatory training would not be paid.  Store Manager

Terry Shea-Gehlert told her that LEARNet training was a job requirement that just needed to be completed, and that it was unpaid.[2]  I credit Guillotte's testimony, and find that the CVS store and pharmacy managers, as well as Lead PTs, knew that Guillotte performed LEARNet training off-the-clock and was not compensated for that work.

During their employment, both Plaintiffs made efforts to draw attention to the fact that they were not compensated for hours worked, and there was widespread knowledge of the same throughout the supervisory and managerial structure in place at Store No. 8.  This was contrary to CVS's own policies on the matter, although the Plaintiffs only availed themselves of some of the mechanisms offered by CVS's employee handbook as a remedy.

*The amount of uncompensated time*

Every LEARNet training module has an estimated time for completion based on the total number of words, and the time it took an employee to complete in a mock test in a laboratory environment.  St. Pierre and Guillotte testified that the trainings generally took 25% longer to complete than the suggested time assigned by CVS, although it is not clear how they arrived at these approximations other than general recall.  CVS provided the LEARNet training transcripts for St. Pierre and Guillotte, which were admitted as Trial Exhibits 18 and 22.[3]  CVS contends

---

[2] Shea-Gehlert denied telling Guillotte that training was unpaid.  I do not credit this portion of Shea-Gehlert's testimony.

[3] Plaintiffs objected to these exhibits, and argued that they should be excluded as a sanction for the Defendants' spoliation of SiteMinder records. SiteMinder is a security application which tracks logins to CVS systems, such as LEARNet, and captures some logouts.  I declined to exclude the records from evidence, but stated that I would make a negative inference in favor of the plaintiffs, and presume that the spoliated SiteMinder records for St. Pierre and Guillotte were supportive of the Plaintiffs' case, and harmful to the Defendants' case. *See* Docket No. 104. Because the evidence was more than sufficient to sustain the Plaintiffs' claims, I do not make such an inference.

that these transcripts are a complete and accurate list of all training courses engaged in by the Plaintiffs.  While both St. Pierre and Guillotte testified that they had no reason to doubt the accuracy of the training transcript, I understood this to mean that they confirmed the accuracy of the training recorded as completed, but not necessarily that the records were complete.  The training transcript captures all modules (mandatory or optional) an employee completed.

In addition, LEARNet captures the date and time that a user logs in, and some information about the location of the login, but does not capture or record a logout, or how long an employee takes to complete a training.  LEARNet login records for St. Pierre and Guillotte were admitted as Trial Exhibits 17 and 21.  Plaintiffs allege that these exhibits are an incomplete list of logins, and that SiteMinder records, which CVS destroyed, would have shown as much.

CVS had not compared any LEARNet logins with PT payroll because the records of training completed, and the number of logins do not equate to working time.  For example, an employee can login to LEARNet, and then remain logged into the module for up to two hours without being at the computer.  Alternatively, in a scenario where an employee might login and spend an hour or more trying to read and comprehend a training task in a less-than-ideal home working environment (that might have taken 20 minutes under laboratory conditions), and then returned to the task the following day to complete the task, the LEARNet system creates no cognizable record of the work done.

St. Pierre testified that she completed 3-4 hours of LEARNet training per month, and that 75% of that was done on her own time, unpaid.  At her deposition, St. Pierre initially estimated the total number of unpaid training hours to be 40, however, later in her deposition she amended the estimate.  Both in her deposition, and at trial, she claimed she performed 120-140 hours of unpaid LEARNet training during the course of her employment at Store No. 8.  Because

LEARNet only records completion or attempted completion of a training task, it does not provide a useful estimate of the time worked on training off-shift.  LEARNet does not provide records of training started but not completed, and cannot address the issue of how long Plaintiffs took to complete training tasks, or if they took longer to complete them at home than when they were at work.  Nor can LEARNet distinguish if certain employees routinely took longer to complete training tasks.  On reviewing the LEARNet records presented, I find that St. Pierre's approximations are not inconsistent with the records in LEARNet.  Again, I find no evidence other than the Plaintiffs' testimony that permits meaningful clarification of these estimates which are approximations based on memory and subject to the normative inconsistencies of human recall.  I therefore credit St. Pierre's estimates with respect to her recollection of 3 to 4 hours training per month, of which approximately three quarters of that time was completed outside her regular shift, and find that the best estimate of the unpaid hours worked by St. Pierre is 2.63 hours per month.

Guillotte testified that she performed four to five trainings per month, and that about 80% were done at home, with the average training taking about an hour. [4] Subject to the same concerns and caveats with respect to the computer records noted above, on reviewing the LEARNet records presented, I find that Guillotte's approximations are somewhat inconsistent with the records in LEARNet, in that her recollection of four-to-five trainings per month is probably closer to the maximum than an average.  There is evidence that Guillotte completed that many trainings in some months, and it is not unreasonable that it is those months that stick in Guillotte's recollection.  On the other hand, the record shows, and Guillotte has not disputed, that in some months no tasks were completed at all.  This creates a bar to simple averaging, as the

[4] The parties stipulated to the plaintiffs' hourly pay rates.

10

record shows that training tasks were completed episodically in the context of Store No. 8 operating within a limited hours budget.  This suggests a scenario where a requirement to complete mandatory training tasks that themselves appear to be clustered in certain months would inherently drive employees to more off-shift training in those months.  However, I cannot credit Guillotte's estimate of 4-5 hours for every month in the light of the other evidence.  As to the proportion of training time expended in off-shift work and the length of time required per task, I find no evidence other than Guillotte's testimony that permits meaningful clarification of these estimates which, like St Pierre's recollections, are approximations based on recall.  I therefore credit Guillotte's estimates with respect to her recollection of performing the bulk of the tasks at home, and that the tasks took longer than the CVS estimate.

I do not accept Guillotte's estimate for the average number of hours worked per month which, on the basis of all the documentation submitted and consideration of the testimony heard, appears too high.  Considering all the evidence, I find the best estimate would be that which I reached for St. Pierre.  Because St. Pierre and Guillotte performed the same general duties in the same store with similar training loads and work duties, St. Pierre's credible estimate of 2.63 hours/month is the best basis on which to calculate the amounts due on Guillotte's claim, and I adopt that number here.

## Discussion

*Violation of Massachusetts Wage Act, Gen. Laws ch. 149 and ch. 151*

The Massachusetts Wage Act mandates "[e]very person having employees in his service shall pay…such employee the wages earned by him…."  Mass. Gen. L. ch. 149 §148.  In

addition, "[e]very employer shall keep a true and accurate record of … the hours worked each day and each week by each employee…." Mass. Gen. L. ch. 151, § 15.

The parties dispute the standard for liability under the Massachusetts Wage Laws. Citing *Vitali v. Reit Management & Research, LLC*, 88 Mass. App. Ct. 99, 103-04, Defendants assert that, to prevail on their claims, each Plaintiff must prove 1) that she performed unpaid work; 2) that CVS had actual or constructive knowledge of the unpaid work; and 3) the number of hours for which she has not been properly paid. Plaintiffs argue they are not required to prove that CVS had actual or constructive knowledge that they were performing uncompensated work. However, as I found that CVS knew that St. Pierre and Guillotte were working on mandatory training via LEARNet outside of their scheduled shifts, and CVS knew that they were performing this work uncompensated, the Plaintiffs prevail under either standard.[5]

Defendants point to numerous courts that have denied recovery for uncompensated work in cases where the employee failed to identify the time worked using the employer's timekeeping systems because a supervisor would have no basis for knowing the number of hours the employee worked unless the employee reported them. There is ample case law supporting the principle that employers may place the burden on employees to report time that would not otherwise be captured by the employer's timekeeping systems. *See, e.g.*, *Norceide v. Cambridge Health Alliance*, 2014 U.S. Dist. LEXIS 22806, *9 (D. Mass. Feb. 24, 2014) (citing *Frye v. Baptist Mem. Hosp., Inc.*, 495 F. App'x 669, 673 (6th Cir. 2012)); *Gordon v. Kaleida Health*, 299 F.R.D. 380, 394 (W.D.N.Y. 2014). However, these cases are inapposite here, because St. Pierre and Guillotte *tried* to use the employer's timekeeping systems – they reported off-site

---

[5] With respect to the Defendants' argument that actual or constructive knowledge of the unpaid work is required under *Vitali*, the court notes that *Vitali* doesn't consider ch. 149, rather it addresses ch. 151 § 1A, which concerns overtime pay.

training time to their supervisors and managers at Store No. 8 – but were repeatedly told by their supervisors and managers at Store No. 8 that time spent on mandatory training was not paid. The Defendants' suggestions that employees should have done more to try to get paid are disingenuous, and neglect the imbalance of power in the employee/employer relationship that the Wage Act and related statutes were intended to redress.

Defendants argue that mere access to training records that would show work was performed doesn't constitute "constructive knowledge" where supervisors don't regularly review the records, and those records weren't used for payroll purposes. However, I do not impute CVS's knowledge solely from the LEARNet training records, but from actual knowledge of its Lead PTs, pharmacy managers and store manager. Defendants' argument that knowledge that one employee was working uncompensated does not place it on notice that others were also working uncompensated is likewise fatuous, because evidence on the record established that CVS specifically knew that the two plaintiffs in this case, St. Pierre and Guillotte, were working at home and not being compensated for that time.

Defendants cite *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 109 (4th Cir. 1988) and other out-of-district cases for the proposition that an employer's knowledge of certain instances of off-the-clock work does not put it on notice of all unpaid work during the plaintiffs' employment, and thus St. Pierre and Guillotte must prove that CVS had knowledge of each instance of off-the-clock work or prove an established pattern and practice of not paying for such work. The present case, however, does not actually concern numerous discrete instances of off-the-clock work, but rather a body of work of the same type carried out in the same manner as shown in the LEARNet records and the broad language of the denials. Non-limiting but important examples of the factors that link all the instances of unpaid work are the general requirement to complete

training, the expectation and knowledge that the training would be done at home, and the general indication that training completed at home was either unpaid due to a pervasive inability to schedule such time due to hours budgeting/capping in Store No. 8, or simply unpaid as a matter of Store No. 8 policy.

Defendants further argue that, for an employer to be imputed with knowledge of off-the-clock work, the knowledge must be held by a staff member sufficiently senior to have responsibility to control payment to staff.  Defendants thus argue that knowledge by low-level supervisors lacking such authority would be insufficient to establish actual or constructive knowledge.  *See Hernandez v. City Wide Insulation of Madison, Inc.*, 2006 U.S. Dist. LEXIS 48399, at \*10 (E.D. Wis. July 14, 2006); *Dole v. Continental Cuisine, Inc.*, 751 F. Supp. 799, 802 (E.D. Ark. 1990); *Pforr*, 851 F.2d 106; *Maciel v. City of L.A.*, 569 F.Supp. 2d 1038, 1048 (C.D. Cal. 2008); *Thiebes v. Wal-Mart Stores, Inc*., 2004 U.S. Dist. LEXIS 15263, at \*13-14 (D. Or. July 26 2004). However, the "low-level supervisors" to which the Defendants refer here – the Lead PTs – were immediately responsible for enabling the payroll mechanisms to capture off-shift work by adding PTs completed training hours to the schedule so that the PTs could be paid. CVS asks me to parse this role from that of the store manager who actually completed payroll, but as discussed above, there was no such ignorance on behalf of the store manager, thus defeating the Defendants' argument factually.

*Breach of Contract*

For the plaintiffs to prevail on their breach of contract claim, they must prove 1) the existence of a valid contract; 2) that the defendant breached the contract; and 3) that the plaintiffs suffered damages as a result of that breach.  *Wells Fargo Bank, N.A. v. Mistovich*, 85 Mass. App.

Ct. 1115 (2014). Defendants assert that Plaintiffs failed to establish the existence of a contract with respect to the payment of training time.  I disagree.

That CVS was the employer of plaintiffs is a stipulated fact that has never been a subject of dispute in this case.  *See, e.g.*, *Joint Stipulated Facts,* Dkt. No. 110.  "The plain and common understanding of 'employer' is the entity with which an employee has *an express or implied contract to work for compensation* and from which he receives pay." *Rogier v. Chambers*, 2016 WL 5890024, at *4 (Mass. Super. Sept. 1, 2016) (emphasis added) (citing Black's Law Dictionary (2009)).  Moreover, CVS conceded that mandatory LEARNet training is compensable "work", and further, there is significant evidence on record to support this.  *See, e.g.*, Tr. Exhibit 12 (CVS training module defining "work" to include "completing training required by the company").  Thus, plaintiffs met their burden of proving the existence of at least an at-will employment contract in which they would perform work for defendants, including mandatory training, in exchange for wages.  Plaintiffs further established at trial that they were not paid for time worked in breach of that contract, and suffered damages by way of lost wages as a result, and have thus met their burden with regard to their breach of contract claim.


*Damages*

Under Massachusetts law, it is an employer's duty to maintain time records for its employees.  Mass Gen. L. ch. 151 § 15.  In *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187 (1946), *superseded by statute on other grounds as recognized in Integrity Staffing Solutions, Inc. v. Busk*, ___ U.S. ___, 135 S.Ct. 513 (2014), the Supreme Court specifically addressed the need to approximate damages when an employer has failed to keep complete written records of compensable work performed such that "[t]he damage is …certain [while]

….[t]he uncertainty lies only in the amount of damages arising from the statutory violation by the employer." *Anderson*, 328 U.S. at 688, 66 S.Ct. at 193.

*Andersen* articulates a two-part standard allowing employees to recover approximate damages arising from unpaid wages "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes...." *Id.* at 687.  An employee must prove 1) that he "performed work for which he was improperly compensated," and 2) produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*  If an employer then fails to rebut with precise data, or otherwise negate the reasonableness of the inference, a court can award damages, "even though the result be only approximate." *Id.* at 688.

While in *Andersen* the Court was considering claims under the FLSA, the principles outlined are applicable to the parallel situation under the Massachusetts wage laws, as the Court's argument was based in preserving the benefit of the statute and the "great public policy that it embodied," while avoiding the "perversion of fundamental principles of justice" that would occur were a court "to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Id.* at 687-88 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250 (1931)).

CVS did not maintain records of the plaintiffs' off-site training hours, and contends that this is only because plaintiffs failed to follow the CVS timekeeping policies requiring such hours be submitted.  However, having been told on more than one occasion by supervisors and managers that mandatory training hours done off-shift were not compensable, Plaintiffs did not submit their time spent working off-site, and did not keep written records of these hours.  While CVS produced LEARNet records for both plaintiffs in an attempt to establish a reasonable

estimate of the time worked off-site, as discussed at length above, these records are not an adequate representation of the time worked, and attempts to clarify the amount of work associated with at least some of the LEARNnet events are frustrated as a result of the missing SiteMinder records which might otherwise have provided some context within which LEARNet events could have been interpreted.

In arriving at the estimate of 2.63 hours/month, I acknowledge that contemporaneous written records would have provided a better basis for estimation, but the LEARNet records provide the minimal factual basis required to show that uncompensated work was performed.  I then follow *Andersen* and bridge the gap to a quantitative approximation based on my reading of the factual record and testimony in order to determine the extent to which Plaintiffs have (and have not) established their claims as a matter of just and reasonable inference, while taking into account argument by the Defendants that rebuts the Plaintiffs' claims with precise data, or otherwise undermines the reasonableness of their assertions.

I do not accept the Defendants' assertion that timing developed by an operator in a laboratory setting is relevant to every employee, or an employee attempting to work in the home environment.  Such studies cannot precisely measure the work actually performed and do not undermine the reasonableness of the Plaintiffs' approximations.  Similarly, pointing to inconsistencies in the Plaintiffs' recollection and estimation of the number, duration, and location of training tasks cuts little ice.  These were obviously *post hoc* estimates, but they are the approximations that I am left to work with because Store No. 8 failed in its statutory duty to operate a system that allowed the Plaintiffs to record and be paid for the time that they worked.

I must also discard the Defendants' underlying assumption that every task *completed* at work was necessarily wholly undertaken *at* work (rather than off the clock).  It is very hard to

accurately determine how long the Plaintiffs took to complete their training tasks due to the functionality of the LEARNet system.  Although the Defendants have offered alternate approximations, these are not based in precise record keeping of the hours worked, and do not undermine the reasonableness of the Plaintiffs' claims that I have accepted.  As the Defendants acknowledge, their destruction of the SiteMinder records was unfortunate because, in the final analysis, even if they allowed examination of only a few training events with actual start and stop times, it might have provided an objective window into how much time employees were logged on.  I acknowledge that time on the system is an imperfect measure of work done (perhaps employees stepped away from the computer, or alternately printed the material for reading in hard-copy and logged off).  Nevertheless, SiteMinder records could have been used to corroborate or refute the subjective estimates that I have before me of the unpaid time spent on the training system.  Because I no longer have the ability to look at that information, I must approximate the time based on the totality of the evidence, testimony, and the weight I attach to the testimony.

For the reasons outlined above, St. Pierre is due compensation for 2.63 hours for each month worked as a just and reasonable estimate of the unpaid time accrued based on the records submitted and the testimony heard.  Because St. Pierre left Store No. 8 by July 31, 2015, I find that she is not due payment for uncompensated hours after July 2015.  Otherwise, I generally accept St. Pierre's calculation of the amount due to her when adjusted to accommodate my determination of 2.63 hours/month.  As shown in the table below, St. Pierre is thus awarded $903.30 in unpaid wages, which is subject to mandatory trebling under the Wage Act, bringing her total damages award to $2,709.90.  Mass Gen. L. ch. 149 §§ 148, 150.

I do not accept Guillotte's estimate for the mean number of hours worked per month which, on the basis of documentation submitted and testimony heard, appears high.  Following *Andersen*, I don't wish to unduly penalize Guillotte for the failure of CVS's record keeping, but it would also be improper to credit that portion of her claim that does not appear reasonable. However, as the fact finder I am still prompted by the considerations outlined in *Andersen* to sift through the totality of the evidence to find an approximation that is just and reasonable.  As St. Pierre and Guillotte performed the same general duties in the same store with similar training loads and work duties, I apply the same estimate of 2.63 hours/month as the best basis on which we can approximate the amounts due to Guillotte's claim, and I adopt that number here.  Accordingly, Guillotte is awarded $1,499.50 in unpaid wages, which after trebling brings her total damages award on her Wage Act claim to $4,498.50.

Plaintiffs are also entitled to prejudgment interest on their Massachusetts wage law claims, beginning on the date this action was commenced.  Mass Gen. L. ch. 231 § 6H ("In any action in which damages are awarded, but in which interest on said damages is not otherwise provided by law, there shall be added by the clerk of court to the amount of damages interest thereon at the rate [of twelve percent per annum] to be determined from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law."); *George v. Nat'l Water Main Cleaning Co.*, 477 Mass. 371, 372-73 (2017) (prejudgment interest "plainly could be added under G. L. c. 231, § 6H" for Wage Act claims).  However, regarding the matter of prejudgment interest on the amounts that are the result of trebling under the Massachusetts wage laws, prejudgment interest does not apply to those amounts.  *George*, 477 Mass. at 380-81 ("Prejudgment interest is still to be added to the amount of lost wages and benefits, and is still not to be added to the trebled

portion of the judgment that previously had been punitive damages and is now characterized as liquidated damages.").

With respect to the months worked that predate the statute of limitations cutoff for the Wage Act, the failure to pay for work performed constitutes an ordinary breach of the contract between the employee and employer.  As St. Pierre did not begin work at CVS until April 2011, she is not entitled to damages for breach of contract.  Guillotte is awarded damages for her breach of contract claim, covering the period November 2007 until November 2010, in the amount of $1,640.80.  In addition, pre-judgement interest has accrued on the amount due during that period.  Mass. Gen. L. ch. 231, § 6C. ("In all actions based on contractual obligations, upon a[n]… order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages…at the rate of twelve per cent per annum from the date of the breach or demand.").  Accordingly, Guillotte is entitled to prejudgment interest on damages for her breach of contract claim beginning in November 2007, the earliest date of breach within the statutory period.

| St. Pierre | hours | rate | earnings subject to PJI | balance of award (no PJI) | | |
|---|---|---|---|---|---|---|
| Jul-11 | 2.63 | 12.24 | 32.1912 | 64.3824 | | |
| Aug-11 | 2.63 | 12.24 | 32.1912 | 64.3824 | | |
| Sep-11 | 2.63 | 12.24 | 32.1912 | 64.3824 | | |
| Oct-11 | 2.63 | 12.24 | 32.1912 | 64.3824 | | |
| Nov-11 | 2.63 | 12.24 | 32.1912 | 64.3824 | | |
| Dec-11 | 2.63 | 12.24 | 32.1912 | 64.3824 | | |
| Jan-12 | 2.63 | 12.24 | 32.1912 | 64.3824 | | |
| Feb-12 | 2.63 | 12.24 | 32.1912 | 64.3824 | | |
| Mar-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Apr-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| May-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Jun-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Jul-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Aug-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Sep-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Oct-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Nov-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Dec-12 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Jan-13 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Feb-13 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Mar-13 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Apr-13 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| May-13 | 2.63 | 12.48 | 32.8224 | 65.6448 | | |
| Jun-13 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Jul-13 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Aug-13 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Sep-13 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Oct-13 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Nov-13 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Dec-13 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Jan-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Feb-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Mar-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Apr-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| May-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Jun-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Jul-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Aug-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Sep-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Oct-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Nov-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Dec-14 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Jan-15 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Feb-15 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Mar-15 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Apr-15 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| May-15 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Jun-15 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Jul-15 | 2.63 | 12.73 | 33.4799 | 66.9598 | | |
| Totals | | | 903.2998 | 1806.6 | | |

21

**Guillotte**

| | hours | rate | earnings (subject to PJI) | balance (not subject to PJI) i.e. 2 x earnings | |
|---|---|---|---|---|---|
| Nov-07 | 2.63 | 16.35 | 43.0005 | | |
| Dec-07 | 2.63 | 16.35 | 43.0005 | | |
| Jan-08 | 2.63 | 16.35 | 43.0005 | | |
| Feb-08 | 2.63 | 16.35 | 43.0005 | | |
| Mar-08 | 2.63 | 17.1 | 44.973 | | |
| Apr-08 | 2.63 | 17.1 | 44.973 | | |
| May-08 | 2.63 | 17.1 | 44.973 | | |
| Jun-08 | 2.63 | 17.1 | 44.973 | | |
| Jul-08 | 2.63 | 17.1 | 44.973 | | |
| Aug-08 | 2.63 | 17.1 | 44.973 | | |
| Sep-08 | 2.63 | 17.1 | 44.973 | | |
| Oct-08 | 2.63 | 17.1 | 44.973 | | |
| Nov-08 | 2.63 | 17.1 | 44.973 | | |
| Dec-08 | 2.63 | 17.1 | 44.973 | | |
| Jan-09 | 2.63 | 17.1 | 44.973 | | |
| Feb-09 | 2.63 | 17.1 | 44.973 | | |
| Mar-09 | 2.63 | 17.44 | 45.8672 | | |
| Apr-09 | 2.63 | 17.44 | 45.8672 | | |
| May-09 | 2.63 | 17.44 | 45.8672 | | |
| Jun-09 | 2.63 | 17.44 | 45.8672 | | |
| Jul-09 | 2.63 | 17.44 | 45.8672 | | |
| Aug-09 | 2.63 | 17.44 | 45.8672 | | |
| Sep-09 | 2.63 | 17.44 | 45.8672 | | |
| Oct-09 | 2.63 | 17.44 | 45.8672 | | |
| Nov-09 | 2.63 | 17.44 | 45.8672 | | |
| Dec-09 | 2.63 | 17.44 | 45.8672 | | |
| Jan-10 | 2.63 | 17.44 | 45.8672 | | |
| Feb-10 | 2.63 | 17.44 | 45.8672 | | |
| Mar-10 | 2.63 | 18 | 47.34 | | |
| Apr-10 | 2.63 | 18 | 47.34 | | |
| May-10 | 2.63 | 18 | 47.34 | | |
| Jun-10 | 2.63 | 18 | 47.34 | | |
| Jul-10 | 2.63 | 18 | 47.34 | | |
| Aug-10 | 2.63 | 18 | 47.34 | | |
| Sep-10 | 2.63 | 18 | 47.34 | | |
| Oct-10 | 2.63 | 18 | 47.34 | | |
| Nov-10 | 2.63 | 18 | 47.34 | **94.68** | Triple Damage Period Commences |
| Dec-10 | 2.63 | 18 | 47.34 | **94.68** | |
| Jan-11 | 2.63 | 18 | 47.34 | **94.68** | |
| Feb-11 | 2.63 | 18 | 47.34 | **94.68** | |
| Mar-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Apr-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| May-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Jun-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Jul-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Aug-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Sep-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Oct-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Nov-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Dec-11 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Jan-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Feb-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Mar-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Apr-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| May-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Jun-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Jul-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Aug-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Sep-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Oct-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Nov-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Dec-12 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Jan-13 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Feb-13 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Mar-13 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| Apr-13 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| May-13 | 2.63 | 18.45 | 48.5235 | **97.047** | |
| **Totals** | | | **3140.299** | **2998.989** | |

**Conclusion**

For the reasons set forth above, the Court finds in favor of the Plaintiffs on all claims. With respect to her Wage Act claim, Plaintiff St. Pierre is awarded $2,709.90, plus prejudgment interest on $903.30 of that award, beginning on the commencement date of this action.  Plaintiff Guillotte is awarded $4,498.50 for her Wage Act claim, and $1,640.80 for her Breach of Contract claim.  Guillotte is entitled to prejudgment interest on the full $1,640.80 award for her breach of contract claim, beginning in November 2007.  She is entitled to prejudgment interest on $1,499.50 of her $4,498.50 award for her Wage Act claim beginning on the date this action was commenced.

SO ORDERED.

**/s/ Timothy S. Hillman**
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**